**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DITTMAN & GREER, INC., | : | |
|     Plaintiff | : | |
| | : | |
|         v. | : | 3:09-cv-1147 (CFD) |
| | : | |
| CHROMALOX, INC., | : | |
|     Defendant. | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**RULING ON MOTION FOR PRELIMINARY INJUNCTION**

**I.     Introduction**

This case involves the termination of a sales contract between plaintiff Dittman & Greer, Inc. ("D & G") and defendant Chromalox, Inc. ("Chromalox").  D & G claimed that the relationship was a franchise under Connecticut Law and has moved for a preliminary injunction against the termination.[1]

---

[1]This is an action brought under the diversity jurisdiction of the Court.  The parties agree that Connecticut substantive law applies.

## II. Background[2]

Plaintiff D & G is a supplier of electric heating, control, and automation products for use in industrial processes in the Northeast.  Defendant Chromalox is a manufacturer of electric heat and control products which are sold worldwide.  Since 1950, D & G has been the exclusive seller of Chromalox products in Connecticut, Rhode Island, and western Massachusetts, pursuant to two written contracts.  In 2000, the parties expanded D & G's territory to include Maine, New Hampshire, Vermont, and the remainder of Massachusetts.  At that time, they also agreed that D & G would serve as a "stocking representative" for Chromalox, whereby D & G could purchase Chromalox products at a discount and resell those products to customers.

Under the more recent sales agreement, executed in 2000, provision 12(a) permitted either party to terminate the relationship, with or without cause, by providing a sixty-day notice in writing.  On June 15, 2009, Chromalox sent a letter to D & G terminating the agreement.  In response, D & G filed this action on July 21, 2009 to prevent cancellation of the contract under Connecticut state law.  D & G moved for both a temporary restraining order and a preliminary injunction.  The request for a temporary restraining order was denied and an evidentiary hearing was held on the merits of the request for a preliminary injunction.

## III. Applicable Law

### A. Preliminary Injunction Standard

The U.S. Court of Appeals for the Second Circuit has cautioned that preliminary

---

[2]The following constitute the Court's findings of facts and conclusions of law.

injunctive relief "is an extraordinary and drastic remedy which should not be routinely granted."

Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir.1981) (internal

quotation marks omitted).  To obtain a preliminary injunction the plaintiff must demonstrate: (1)

that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of

success on the merits or (b) sufficiently serious questions going to the merits to make them a fair

ground for litigation, and a balance of the hardships tipping decidedly in its favor.  Lusk v. Vill.

of Cold Spring, 475 F.3d 480, 485 (2d Cir. 2007).

     In Tom Doherty Assoc., Inc. v. Saban Entm't, Inc., 60 F.3d 27 (2d Cir.1995), the Second

Circuit considered the circumstances under which the loss of a single product line could

constitute irreparable harm for purposes of a preliminary injunction. The Court reasoned that, in

the typical situation where money damages can be readily calculated, there is usually no

irreparable harm. 60 F.3d at 38.  However, the Court noted that if the calculation of damages

would be speculative, or if the discontinuance of the product would result in the discontinuance

of the business, preliminary injunctive relief may be appropriate.  Id.  Here, D & G presented

evidence that Chromalox sales constituted more than a third of its business, measured in terms of

sales and gross profits.  D & G also asserted that approximately seventy percent of its customers

bought Chromalox products and losing that product line would necessitate lay-offs for a third of

its employees.  However, D & G can quantify its losses if its relationship with Chromalox ends.

Furthermore, the business of D & G would likely continue in the event that the contract with

Chromalox is allowed to terminate.  The many other product lines that D & G markets as well as

the ability to now market products that compete with Chromalox indicate that irreparable harm

has not been established.

The second prong of the preliminary injunction standard - "likelihood of success on the merits" - turns on whether D & G is a franchise of Chromalox under Connecticut law.  Since a franchisee may not be terminated without good cause under state law, see Conn. Gen. Stat. § 42-133f(a), D & G must first show that it is a franchisee in order to establish a likelihood of success on the merits.

**B. Definition of "Franchise"**

The Connecticut Franchise Act (the "Act") describes a franchise as an agreement or arrangement whereby "a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor" and "the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol designating a franchisor or its affiliate." Conn. Gen. Stat. § 42-133e(b).  When such a relationship exists, the Act prohibits a franchisor from trying to "terminate, cancel or fail to renew a franchise, except for good cause," including "the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement." Conn. Gen. Stat. § 42-133f(a).

Thus, two main factors have informed the judicial determination of whether a business relationship between two parties constitutes a franchise: whether the franchisee operated under a "marketing plan" substantially prescribed by the franchisor and whether the franchisee's business is "substantially associated" with the franchisor.  In Hartford Electric Supply Co. v. Allen-Bradley Co., Inc., 250 Conn. 334 (1999), the Connecticut Supreme Court set forth several factors

to guide the "marketing plan" analysis, including whether the franchisor controlled the hours and days of operation, advertising, lighting, employee uniforms, prices, trading stamps, hiring, sales quotas, and management training, as well as whether the franchisor provided financial support to the franchisee, audited its books, or inspected its premises. 250 Conn. at 350.  Under the "substantial association" prong, the level of association between the two parties need not be complete or exclusive in order to be "substantial."  Id. at 359.  The analysis of both factors depends not only on the written agreements between the parties, but also their conduct.  See id. at 348.  Since the Act was intended to protect a franchisee from a franchisor exercising an unfair degree of economic leverage, the statute has been interpreted broadly in favor of the plaintiff.  See Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1180 (2d Cir. 1995).

## IV. Discussion

### A. Marketing Plan

D & G argues that Chromalox prescribed a marketing plan which required D & G to submit its marketing plans for approval, set the prices at which D & G could sell Chromalox products, set sales quotas and inventory requirements, and trained D & G employees regarding Chromalox products.  For the following reasons, this Court finds that these fall short of establishing that D & G operated under a marketing plan that was substantially prescribed by Chromalox.

As a preliminary matter, the agreements between the parties define D & G not as a franchisee of Chromalox, but rather as an independent contractor.  See Defendant's Exhibits 1-2. While the label used by the parties is relevant to determining whether a franchise exists, it is

certainly not dispositive.  See Contractors Home Appliance, Inc. v. Clarke Distribution Corp.,

196 F.Supp.2d 174, 177 (D. Conn. 2002), citing Petereit, 853 F.Supp. at 60 (D. Conn. 1993).

See also Hartford Electric, 250 Conn. 334, 349; Edmands v. CUNO, 277 Conn. 425, 441 (2006).

      D & G showed that Chromalox required each of its sales offices to submit annual sales

and marketing plans and also meet sales quotas.  As a sales office, D & G complied with this

request and provided plans to Chromalox.  See Plaintiff's Exhibits 5-6.  In Hartford Electric, the

Connecticut Supreme Court found that a franchise relationship existed between two parties

where a marketing plan was dictated to the distributor by the manufacturer and was used as a

means to control the distributor's operations.  250 Conn. at 350.  In that case, the manufacturer

used the plan as a means to intervene in the distributor's business by suggesting the hiring of

"specialized employees," recommending sales promotions and even participating in closing sales.

Id. at 351.  However, the plans in this case were not dictated to D & G by Chromalox.  Instead, D

& G and the other offices were given the autonomy to select targets within their own region.  See

Plaintiff's Exhibit 7; Defendant's Exhibit 23.  Moreover, the plans and quotas were used not to

control D & G, but rather to select award winners for an annual sales office contest and to

encourage increased sales in certain locations and of certain products.  See Plaintiff's Exhibits 6,

27-28, 29-32.  As such, these plans were simply sales goals and recommended approaches,

instead of a prescribed plan from Chromalox to D & G.  An annual plan between two parties to

formulate a strategy for identifying new customers or emphasizing certain product lines does not

necessarily indicate a marketing plan that is substantially prescribed by a franchisor to a

franchisee, but is commonplace between manufacturers and sales representatives.  See Edmands,

277 Conn. at 447-48 (2006) (holding that a plan that did "nothing more than set sales goals" was

not a marketing plan substantially prescribed by a franchisor).

D & G also argued that Chromalox set the prices at which D & G could sell the products, through either explicit or implicit means. In determining the existence of a marketing plan, pricing is one of the most significant criteria. "Price is perhaps the most fundamental aspect of a marketing plan" because price control "effectively deprives distributors of independent judgment in conducting their business." Petereit, 63 F.3d at 1181. On this point, Hartford Electric is again instructive. The Court found a franchise in part because the manufacturer "absolutely dictate[d]" the prices that the distributor could charge when selling to the manufacturer's national clients and also used a price catalogue to set prices. 250 Conn. at 352. Direct pricing is not necessary to support the finding of a marketing plan. But where one party offers the other party a discount for resale and merely suggests retail prices without specifically fixing those prices, the price setting factor in the franchise analysis is lacking. See Edmands, 277 Conn. at 443 (holding that a distributor was not a franchise where manufacturer suggested retail prices but did not expressly set them); B & E Juices, Inc. v. Energy Brands, Inc., 2007 WL 3124903 at *13-15 (D. Conn. October 25, 2007) (finding that no franchise existed where the manufacturer controlled only the price paid for their products by the distributor and not the price at which the distributor resold them).

In this case, D & G acted both as a sales representative for Chromalox and was able to purchase Chromalox products for resale as a "stocking representative." Chromalox established a price sheet that contained the list prices for many of its products. However, Chromalox allowed D &G to offer discounted prices. As a result, D & G could sell those products to third parties at prices it set. Chromalox also did not know what customers purchased these resold products. See

Testimony of William Kennedy.  While the publication of list prices placed a *de facto* cap on the prices D & G could charge for Chromalox products, even with this limitation it indicates a simple sale and resale arrangement as opposed to franchisor price-setting.  Even actual commission rates for the sales representation aspect of the relationship fluctuated based on the price at which the product was sold to the customer, which was set by D & G.  D & G and Chromalox also negotiated raises and commissions for certain sales.  Thus, Chromalox did not set prices for D & G to the extent necessary to imply a marketing plan substantially prescribed by a franchisor.

In addition to its arguments about the marketing plan and the setting of prices, D & G argues that Chromalox acted as a franchisor by setting inventory requirements.   Inventory requirements have indicated a marketing plan substantially controlled by the franchisor where a manufacturer required a distributor to submit monthly inventory reports, maintain a certain level of inventory, and enforce minimum purchase amounts for certain products.  See Hartford Electric, 250 Conn. at 354-55.  On the other hand, requiring a distributor to keep a certain level of inventory on hand for the limited purposes of meeting immediate sales needs and participating in ongoing promotions does not indicate a marketing plan controlled by a franchisor.  See B & E Juices, 2007 WL 3124903 at *15.  Similarly, requiring minimum purchase volumes on a short-term basis does not establish a franchisor-controlled marketing plan.  See id. at *14.  D & G presented evidence that Chromalox required inventory levels that were sufficient to serve local sales needs and to require inventory information if requested.  See Plaintiff's Exhibit 4.  However, nothing in the record indicates that Chromalox ever exercised either right.  As such, these inventory requirements were not strongly indicative of a franchisor-controlled marketing

plan.

D & G also argues that Chromalox prescribed a marketing plan that centers around the training of Chromalox personnel.  In Hartford Electric, the manufacturer provided "frequent, intensive training" to the distributor's employees, required the distributor to create a training center for its employees at its own expense, and once penalized the distributor for not sending its employees to the training sessions.  250 Conn. at 354.  Here, Chromalox required certain D & G employees to meet limited training requirements, which consisted of one annual in-person session, four annual phone sessions, and one annual test.  See Plaintiff's Exhibit 26.  Additional training was necessary for D & G to be eligible for certain bonus and incentive programs.  See id. Chromalox also required the President of D & G to attend a one-time summit for sales offices that were underperforming in the area of heating cable sales.  See Plaintiff's Exhibit 22.  While there was some degree of required training, this limited amount does not rise to the level detailed in Hartford Electric.  Similarly, certain aspects of the training pertained only to D & G's eligibility for special bonuses and incentives.  Providing training to a small number of employees and at summits does not indicate a franchisor-controlled marketing plan.  See B & E Juices, 2007 WL 3124903 at *13.  Such training by Chromalox also reflects typical efforts by the manufacturers to educate sales representatives about their products for mutual success.

Thus, these factors fall short of indicating that D & G operated under a marketing plan substantially prescribed by Chromalox.  In addition, the record lacks any evidence that Chromalox restricted D & G's ability to sell other product lines, required financial reporting or auditing of D & G's books, played any role in the hiring or firing of D & G's employees, required D & G employees to wear Chromalox uniforms, or dictated the hours of operation of D & G.

See B & E Juices, 2007 WL 3124903 at *15; Bowmont Corp. v. Krombacher Brauerei Bernhard

GmbH & Co., 2003 WL 22205615 at *5 (D. Conn. September 08, 2003); Edmands, 277 Conn. at

444-46.  These factors, while not conclusive, further reinforce that a franchisor-controlled

marketing plan did not govern the relationship between D & G and Chromalox.

 D & G argues that the holding in Hartford Electric, that a franchise existed between the

manufacturer of electrical equipment and its distributor, compels the same result in this case.

However, the marketing plan in Hartford Electric was dictated by the manufacturer to a degree

that is not present in this case.  There, the manufacturer not only recommended the hiring of

specific employees and prescribed promotions to the distributor, but went so far as to participate

in closings with customers where the manufacturer felt the distributor had not followed the plan

closely enough.  Hartford Electric, 250 Conn. at 351-52.  In this case, D & G coordinated with

Chromalox on strategies and targets, but interacting with the customers was the sole prerogative

of D & G.  See Testimony of William Kennedy.  Price levels in Hartford Electric were absolutely

dictated by the manufacturer.  250 Conn. at 352.  Here, D & G purchased products from

Chromalox (often at a discount) and resold them to customers.  See Plaintiff's Exhibit 44.  The

manufacturer in Hartford Electric held and exercised the right to inspect the distributor's records

and require financial audits, 250 Conn. at 355, while Chromalox has not.  In addition, the limited

training required of D & G employees by Chromalox, see Plaintiff's Exhibit 26, falls short of the

intense training in Hartford Electric, where the manufacturer required the distributor to operate

its own training center and punished the distributor for not sending employees to training

sessions.  See 250 Conn. at 354. Overall, the marketing plan in Hartford Electric was considered

a franchise arrangement because the manufacturer dictated many aspects of the distributor's

operation.  See id. at 356.  The manufacturer published action lists which mandated that

particular distributor employees perform specific actions by strict deadlines.  See id.

Chromalox's actions to formulate a marketing plan with D & G do not rise to the level of control

by the manufacturer found in Hartford Electric.


### B. Substantial Association

Turning to the second prong of the franchise analysis, D & G argued that it has been the

"face" of Chromalox throughout New England for fifty years.  See Testimony of Harlan

Fredericksen; Testimony of William Kennedy; Testimony of William Newbauer.  More

specifically, D & G contended that Chromalox was "joined at the hip" with D & G and referred

to D & G as its "Middletown Office."  See Plaintiff's Exhibits 7-8, 12-22.  In further support of a

"substantial association," D & G noted that some of its personnel carried business cards with the

Chromalox name and logo, and that their office distributed catalogues produced by Chromalox

bearing both company's logos.  See Plaintiff's Exhibits 34, 36.  Prior cases have found the use of

a manufacturer's stationery, see Carlos v. Philips Bus. Systems, Inc., 556 F.Supp. 769, 776

(E.D.N.Y. 1983), and the distribution of the manufacturer's literature by the distributor, see

Hartford Electric, 250 Conn. at 359-60, as indications of a franchise relationship.  However,

these facts alone are not enough to show that D & G is substantially associated with Chromalox's

trademark.  The record lacks evidence showing that D & G utilized company signage bearing the

Chromalox logo.  See Hartford Electric, 250 Conn. at 359-60; Contractors Home Appliance, 196

F.Supp.2d at 180 (D. Conn. 2002).  Nor has D & G used "Chromalox" or the name of a

Chromalox product in its trade name.  See Philips Bus. Systems, 556 F.Supp. at 776.  In fact, D

& G's website depicted the Chromalox logo as one of many companies whose products were

sold by D & G.  See Defendant's Exhibit 8.  D & G sells the products of nineteen other

manufacturers.  Substantial association is evident when the distributor employs such extensive

use of the manufacturer's name and logo that it appears to be its franchisee.   See Philips Bus.

Systems, 556 F.Supp. at 776 (finding a franchise where the distributor answered the phone using

the manufacturer's company name).  In the end, while D & G is certainly aligned with

Chromalox in New England, the level of association does not rise to the level necessary to

indicate a franchise.

Additionally, the percentage of D & G sales and profits is not sufficient to indicate a

franchise relationship when considered with the other evidence.  Chromalox products account for

forty-two percent of D & G's total sales and thirty-three to thirty-four percent of D & G's gross

profits.  See Testimony of Harlan Fredericksen.  While significant, these levels fall short of

percentages where courts have historically identified franchise relationships.  Courts have not

found distributors to be franchises when the manufacturer's products account for three percent,

see Grand Light & Supply Co., Inc. v. Honeywell, Inc., 771 F.2d 672, 677 (2d Cir. 1985), or ten

percent, see Sorisio v. Lenox, Inc., 701 F.Supp. 950, 961-62 (D. Conn. 1988), of total sales.

More significant, a distributor whose annual sales exceeded forty percent was found not to be

"substantially associated" with that manufacturer.  See Rudel Machinery Co. Inc., v. Giddings &

Lewis, Inc., 68 F.Supp.2d 118, 124-28 (D.Conn.1999).  Although fifty percent of total sales

(along with other evidence) helped persuade the Connecticut Supreme Court to find a franchise

in Hartford Electric, see 250 Conn. at 361, the percentage of D & G's total sales falls is less than

adequate to constitute "substantial association," when considered in combination with the other

-12-

factors, especially given the number of product lines D & G sells.

An examination of gross profits yields a similar result.  In Contractors Home Appliance, this Court found that a distributor was not substantially associated with a manufacturer which accounted for almost fourteen percent of the distributor's gross profits.  196 F.Supp.2d at 180. While D & G's business may be more dependent on Chromalox than the distributor in Contractors Home Appliance, it falls short of another distributor who was not substantially associated with its manufacturer despite relying on the manufacturer for forty percent of gross profits.  See Rudel Machinery, 68 F.Supp.2d at 124-28.  While the percentages of gross profits and total sales alone are not enough to defeat D & G's argument that this element of the statute is satisfied, these findings are nonetheless relevant.  On balance, considering both D & G's use of Chromalox's trademark and D & G's reliance on Chromalox, the evidence does not support a finding of substantial association.

D & G again relies on Hartford Electric to support finding a substantial association between the two parties in this case.  Both cases involve distributors with long-term ties to their manufacturer and who distribute flyers containing the manufacturer's logo.  See Hartford Electric, 250 Conn. at 360.  However, the distributor in Hartford Electric displayed a sign on its premises bearing the manufacturer's name.  Id.  D & G, on the other hand, does not use Chromalox signage at their place of business.  Furthermore, the court in Hartford Electric found that the distributor's entire business would fail if the manufacturer was allowed to terminate the contract.  Id. at 361.  The percentage of D & G's profits and sales that are attributable to Chromalox shows that termination of the contract will have a significant negative effect on D & G.  However, D & G's ability to sustain its business without Chromalox shows that this case falls

-13-

short of the substantial association present in <u>Hartford Electric</u>.


V.      **Conclusion**


        For the reasons set forth above, the plaintiff's motion for a preliminary injunction [Dkt.

#4] is DENIED.[3]

        SO ORDERED this   6th   day of October 2009, at Hartford, Connecticut.



                                          /s/ Christopher F. Droney

                                          **CHRISTOPHER F. DRONEY**

                                          **UNITED STATES DISTRICT JUDGE**

_____

        [3]This Court need not rule on D & G's motion in limine to exclude the affidavits of
Chromalox employees William Kennedy, Joseph Podge, Mark Crombie, and Rickmond Payne
[Dkt. #37].  This Court did not consider the affidavits, but did consider the transcripts of
depositions of William Kennedy of Chromalox and Harlan Fredericksen of D & G, as well as the
testimony of the hearing and exhibits submitted.

        In addition to finding that D & G has not shown a likelihood of success on the merits, this
Court also finds that D & G has not established sufficiently serious questions going to the merits
to make them a fair ground for litigation.  See <u>Lusk</u>, 475 F.3d at 485.  In cases where sufficiently
serious questions have been established, significant factual questions are often in dispute.  <u>See,
e.g.</u> <u>Roso-Leno Beverage Distributors, Inc. v. Coca-Cola Bottling Co.</u>, 749 F.2d 124 (2d Cir.
1984); <u>see also</u> <u>Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.</u>, 604 F.2d 755, 763 (2d
Cir. 1979).  The facts in this case, however, are largely undisputed.  Instead, the primary
disagreement focused on what conclusion followed from the facts and circumstances in this case.
Moreover, even if sufficiently serious questions had been presented, D & G's inability to
demonstrate irreparable harm would have nonetheless precluded a preliminary injunction.  <u>See</u>
<u>Sperry Int'l Trade, Inc.v. Gov't of Israel</u>, 670 F.2d 8, 11 (2d Cir. 1981).